# IN THE MATTER OF THE TRUST ESTATE OF JOHN ENA, DECEASED.

## No. 1764-A.

ARGUED JANUARY 5, 7, 18, 1928.          DECIDED FEBRUARY 6, 1928.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is a proceeding in equity. The trustees filed an annual account. The persons at present entitled as life tenants under the will presented objections to two sets of items in the account. From the ruling of the trial judge upon those objections the case comes to this court by appeal.

A part of the trust property left by the testator consisted of swamp lands situated at Iwilei in Honolulu. In January, 1919, the trustees under the will entered into a contract with the Hawaiian Dredging Company, Limited, for the filling of forty acres of these lands to a specified height and in and by the same contract it was agreed between the parties thereto that the compensation to the dredging company for making the fill should be the grant by the trustees to it of a lease of

twelve acres out of the forty acres so to be filled, for the term of twenty-five years and ten months from the date of the contract. The parties believed that ten months' time would be required for making the fill and the period of the lease was thus agreed upon so as to net to the lessee a term of twenty-five years after the completion of the fill. The fill was made. While in the testimony of one of the witnesses doubt seems to have been cast upon whether the fill was entirely completed within the ten months, the parties upon the issue now before us proceed upon the assumption that it was completed within that time and we shall do the same. The lease was given as contracted for. It reserves to the trustees a nominal rental of one dollar per year and requires the lessee to pay the taxes on the demised property. In the annual account under review the trustees reported one dollar received as yearly rental and credited that amount, and no other income from the twelve acres, to the life tenants. The claim of the life tenants in support of their objection is that in reality they alone have paid for the making of the fill by the grant to the dredging company of the use of the twelve acres free of rent (other than the one dollar and taxes) for the period of twenty-five years and they ask that they be now reimbursed for the amount so paid by them to the dredging company for the making of the fill. The contention of the remaindermen is in effect that the fill was made through the wise action of the trustees without cost either to the life tenants or to the remaindermen,— pointing out in this connection that prior to the making of the fill the swamp lands produced and were capable of producing practically no revenue and were a burden to the life tenants in that they were required to pay the taxes.

The testator left all of his property to the trustees in trust for the following uses and purposes: "After

the payment of my debts and funeral expenses and the legacies below named, to invest such cash from my estate as may come into their hands in some safe investment, and to pay the income of all funds so invested by them and the income from all of my estate both real and personal in equal shares to my wife and to each of my children, namely: Mabel K. Ena, Mary K. Ena, Clarissa K. Ena, Daisey M. Ena, Thomas F. Ena, Anna D. Ena and John Ena, Junior, during the terms of their natural lives; and upon the decease of my wife or any of my children, to pay the share of said income of such beneficiary to her or his issue surviving her or him; and in default of surviving issue, or upon the subsequent death of such issue, to pay the share of the income of such deceased beneficiary to the survivor or survivors in equal shares; the issue of a deceased beneficiary taking the parent's share by right of representation; and upon the death of the last survivor of my said children to divide my estate amongst the children or descendants of my children then living; each of such grandchildren or descendants to take by representation the share that their parent would have been entitled to had I died intestate." Certain provisions in favor of the widow follow, but are immaterial at present. The testator granted to his "trustees and their successors full power to sell, with consent of my wife and such of my children as may be of age at the time of sale, without application to or leave of court, any of my real or personal estate and to invest and reinvest the same in such manner as they may think for the best interests of my estate; purchasers to take free of all trust."

It would not be a correct interpretation of the facts as they occurred to say that the fill was made without cost either to the life tenants or to the remaindermen. It was a valuable fill. The making of it required much labor and material. Had the contract been in the ordi-

nary form, with an undertaking on the part of the dredging company to perform the work and on the part of the trustees to pay in cash, its cost to the trustees would in all probability have been, as the evidence shows, from $100,000 to $120,000. The dredging company did not make a gift to the trustees of this valuable and costly fill. It received what it deemed to be due compensation and that compensation consisted in the right to use the twelve acres (which, like the remainder of the forty acres, it contracted to fill within ten months) for twenty-five years and ten months from the date of the contract, free of rental other than as above stated. Several experts who gave testimony before the trial judge agreed that the value of the lease at its date was $90,000. They arrived at this conclusion by first taking the view (in which they all agreed) that the twelve-acre piece as filled was of the market value of $10,000 per acre or $120,000 for the whole; that a fair annual rental or return on the land would be six per cent of $120,000 or $7200 per year; and that at the commencement of the twenty-five-year period of the lease, i.e., after the completion of the fill, the present worth of the rental of $7200 a year was $90,000. Whether this was the correct method of ascertaining the value of the lease at its commencement we need not consider, for the parties now before us are expressly agreed that it was of the value of $90,000 at that time. Therefore, what the dredging company received as its compensation for making the fill was a total of rentals the present worth of which at that time was $90,000. It is obvious that the rents earned by the twelve-acre piece of land, like any rents earned by other lands left by the testator, were to go under the terms of the will to the life tenants during their respective lives. It is equally clear that if the trustees had paid to the dredging company in cash for the making of the fill what-

ever the agreed price therefor may have been, and had thereupon immediately executed to the dredging company a lease of the twelve acres at $7200 a year, plus taxes, that rental as it was paid from year to year would be the property of the life tenants during the life of the trust. So, also, in our opinion, under the circumstances as they actually occurred, the compensation received by the dredging company being the rental value of the twelve acres, the life tenants during their lives were entitled to that rental value. Upon the filing of the objections now under consideration, the case stood precisely as though the life tenants, without any contribution from the remaindermen, had borne the whole cost of the improvement.

The evidence is undisputed that the swamp lands, prior to being filled, had very little rental value and had a market value for purposes of sale of not exceeding $2000 or $2500 per acre and that their market value at present, after the making of the fill, is about $40,000 per acre. Other portions aggregating about eleven acres in area out of the same forty acres were sold after the fill was made for $434,000; that is at a rate of about $40,000 per acre. Prior to the making of the fill the payment of the taxes on the swamp lands was a burden upon the life tenants. Now, the $434,000 having been invested by the trustees, that portion of the estate yields a revenue of about $17,000 per year net, after payment of the taxes on the forty acres. There can be no doubt that the fill is a permanent improvement. It has become a part of the land. It will certainly last as long as the land itself lasts. It is a benefit to the remaindermen as well as to the life tenants.

The authorities are agreed with reference to improvements of a permanent nature that their cost should be equitably apportioned between the life tenants and the remaindermen. That was substantially the ruling of

this court when it said in another proceeding in this same estate, "we know of no closer approach to fairness than to require, as did the circuit judge, that the remaindermen pay for the principal of the permanent improvements and that the life tenants pay for the principal of the impermanent improvements and the interest on the entire cost of the improvements,—" which meant interest, among other things, on the permanent improvements. *Valentin* v. *Brunette*, 26 Haw. 417, 430, 431. Different methods of applying this principle of apportionment between the remaindermen and the life tenants are resorted to by the courts. They are made necessary by the differing circumstances of the various cases. Some of the cases have complications which the others have not. With reference to mortgages it is generally said that the remaindermen should pay the principal and the life tenants the interest. If, in the case at bar, it were necessary to borrow the money to compensate the life tenants for the cost of the fill, it would doubtless be correct to require the remaindermen to pay ultimately the principal of the mortgage and the life tenants to pay the interest. The same result is attained in the case at bar by requiring the trustees to pay the $90,000 out of the corpus of the estate, selling or transferring for that purpose bonds or other investments of the estate, if necessary, and to pay that amount to the life tenants (with qualifications hereinafter stated) without requiring the life tenants to pay interest to the remaindermen. Under the will of the decedent the remaindermen are not entitled to interest on the corpus of the estate during the lives of the life tenants. They are merely required in this instance to suffer an alteration in the form of the investments in their behalf from bonds or other personalty to an addition to their lands consisting of a fill. The life tenants, on the other hand, are required to suffer the loss of the interest which they have been receiving

and were entitled to receive from the bonds or other personalty. The apportionment referred to by text-writers and courts is thus secured. The remaindermen pay the principal, without paying or losing any interest. The life tenants suffer the loss of the interest, not by paying it to a mortgagee who is loaning the money, but by foregoing the income which they have been in the habit of receiving in the recent past. To require the life tenants, in addition to this arrangement, to pay interest to the remaindermen would be to place the same burden twice upon the life tenants and to give to the remaindermen actual income which they have not received and are not entitled to receive during the existence of the life tenancy.

The two cases most strongly relied upon by the remaindermen in support of their alternative contention that, if they are to be required to pay for the principal of the cost of the improvement, the life tenants should be required to pay to them interest on that cost for the remainder of their lives, are *Plympton* v. *Boston Dispensary,* 106 Mass. 544, and *Moore* v. *Simonson,* 39 Pac. (Ore.) 1105. Neither of these cases, as we understand them, is in conflict with our views or with our proposed decree. In the first of these the facts as stated by the court were that the testator's wife "had two daughters by a former marriage, one of whom had intermarried with his son, John M. Dearborn, and the other died long since. By the will he devised all his real estate in trust to pay one third of the income * * * to his wife for life and after her death to her two daughters, or the survivor of them, for life; and the remaining two thirds of the income in ten equal shares, to various persons for life, namely, one share to his wife for life and her daughters or the survivor of them for life, two to John M. Dearborn for life and after his death to his wife, and one to her for life, and the other six shares

to different persons for life and after their deaths to the Boston Dispensary * * * ; and upon the deaths of all those entitled to share in the income, the whole principal of the trust fund to vest absolutely in the Boston Dispensary. The testator's widow, his son John M., and all the other devisees for life, except the son's wife, died before the bringing of the bill, leaving her entitled, under the will, to nine fifteenths, and the Boston Dispensary to six fifteenths, of the income during her life, and the Boston Dispensary to the whole residue after her death." The testator left it optional with his widow to continue to occupy their home, known as Avon Place, as her home and directed that during the time in which she should occupy the home, "the rent of said house shall be estimated at twenty dollars per calendar month, being at the rate of two hundred and forty dollars per annum," and that the use of the place at such rent should "constitute part of the income secured to her" by a certain contract of jointure. The bill alleged "that the house on Avon Place was occupied under the provisions of the will by the testator's widow during her lifetime, and after her death by John M. Dearborn and wife, and since his death by his wife, paying only the rent mentioned in the will; that she still occupies the house, claiming the right to do so for the same rent; that the yearly rental value long has been much greater than two hundred and forty dollars, and is now more than two thousand dollars;" and that the city of Boston laid out a certain public highway and made assessments for alleged betterments on the estate of the decedent. The question before the court was who should pay the assessment. Remarking that, "as between tenant for life and remainderman, ordinary taxes are to be paid by the tenant for life," the court said: "But when the whole estate is subject to and benefited by the discharge of an incumbrance not created by either, equity will apportion

it ratably between their different interests. In the case of a mortgage, for instance, the tenant for life is bound to keep down the interest, but not to pay the principal; and upon a discharge of the mortgage by the remainderman, a strict adherence to the rule would require the tenant for life to pay interest on the amount during his life; although, for the convenience of all parties, the value of such an annuity is usually estimated and paid at once in gross. * * * An assessment for betterment, under our statutes, upon the laying out of a highway, is a tax; but it is not an ordinary tax; it is an extraordinary assessment laid on the premises; in view of the permanently increased value of the estate by reason of the public improvement in the vicinity. * * * It must therefore be treated as between tenant for life and remainderman as an incumbrance on the whole estate to which the tenant for life must contribute to the extent of interest during his life on the amount paid, and at his death the remainderman bear the charge of the principal. The burden of an assessment for betterment is thus borne by them in the same proportions in which they would have received the benefit of entire damages assessed against the city in case the estate had been injured, instead of being benefited by the improvement. * * * The will of this testator contains no provision as to the payment of taxes, but leaves that to be settled by the general rules of law. The clause as to repairs relates only to expenses voluntarily incurred by the trustees. Mrs. Dearborn is not obliged to occupy the estate on Avon Place, but may do so at her discretion. If she does, the rent, at the moderate rate fixed by the will, is to be computed as part of her share of the income of the trust property, of which that estate forms part. If she does not, the income of this estate, like that of the rest of the trust fund, is to be divided between her and the Boston Dispensary, in the propor-

296

tion of nine fifteenths to her and six fifteenths to that institution. In the first case, so long as she occupies the house on Avon Place, she is tenant for life; Co. Lit. 42 a; and as such must pay the ordinary taxes on the house. In the second case, such taxes would be paid proportionably by her and by the other party entitled to share in the income. The same rule of apportionment must be applied to the payment of interest on the amount paid out of the principal of the trust fund to discharge the assessment for the betterment of the estate in question. So long as she may see fit to occupy it as a dwelling, and thus enjoy the exclusive use of the premises, she must pay the interest. If she should at any time elect to abandon the occupation, the burden of this charge will rest upon her and the Boston Dispensary in the same proportion as the benefit of the income. It would not be equitable to charge her, by reason of her occupation at the time of the assessment, with the present value of an annuity on the amount thereof; because she is not bound by the terms of the will to make her election immediately to occupy the estate throughout her lifetime, and if she should at any time hereafter elect to give up such occupation, she would be chargeable for the rest of her life with only nine fifteenths of the interest. The result is, that the amount of the assessment for betterment is to be paid out of the principal of the trust fund, and interest thereon is to be charged by the trustees annually to Mrs. Dearborn so long as she shall live in the house; and the interest so charged is to be distributed between her and the Boston Dispensary in proportion to their interests in the income, by allowing her to retain nine fifteenths, and collecting from her and paying to that corporation six fifteenths thereof. If she shall at any time cease to live in the house, the trustees will have no occasion afterwards to keep a separate account of the interest on the sum paid

out for the betterment; for that sum, having been paid from the principal of the trust fund, will proportionately diminish the income payable during the rest of her life to her and to the other *cestui que trust.*"

Insofar as the son's wife in that case was entitled to occupy the family homestead at a stated rental per month, that case differs in its facts from the case at bar. There is no similar provision in the will of John Ena in favor of the life tenants or any of them. The court, in the Massachusetts case, because of the fact that the son's wife was entitled to occupy the residence at the stated rental, deemed it to be equitable to direct that interest on the cost of the betterments should be charged by the trustees annually to her, so long as she should live in the house, which interest, however, was to be immediately distributed nine-fifteenths to her and six-fifteenths to the Boston Dispensary. Whether that provision of the decree was necessary or permissible in order to correctly adjust the equities of the parties under the complications of that case, we need not say. In all other respects the argument and the decree of the Massachusetts court support our conclusion and action in the case at bar. The court in that case expressly said that "if she shall at any time cease to live in the house," that is to say, when that particular feature should be eliminated and that case placed on a parallel as to its facts with the case at bar, "the trustees will have no occasion afterwards to keep a separate account of the interest on the sum paid out for the betterment; for that sum, having been paid from the principal of the trust fund, will proportionately diminish the income payable during the rest of her life to her and to the other *cestui que trust,*"—which is precisely what we are requiring to be done under the decree to be entered in this case.

In the Oregon case, a life tenant who had bought in an outstanding title in good faith, believing it to be a necessary protection for the whole estate, was held to be entitled to reimbursement by the remaindermen, "deducting the interest she would have to pay as life tenant during her life." The case was a suit in equity, brought against the life tenant, to have the purchase by her declared to be held in trust for all persons taking under the will. So far as appears from a report of the case, there was no trustee and no trust estate out of which to order reimbursement. There was no order for change of the form of investment, which order would of itself entail a loss of income by the life tenant. The course adopted, therefore, of requiring the remaindermen to pay only the difference between the interest the life tenant would have had to pay during her life, on the one hand, and the total cost of the outstanding title, on the other hand, was merely another way of accomplishing the same result and is not inconsistent with our method of treatment.

The power to lease lands was not expressly granted to the trustees by the will. The question suggests itself whether the lease granted to the dredging company by these trustees will be binding on the remaindermen after the termination of the life tenancies, or, in other words, whether the lease will be good at all events for the full term of twenty-five years or will terminate upon the earlier termination of the trust caused by the death of all of the life tenants. If the lease will continue in effect for the full term of twenty-five years in spite of an earlier termination of the trust, the rentals accruing under the lease after the termination of the trust will, in law and in justice, belong to the remaindermen. If, on the other hand, the lease terminates with the trust prior to the end of the twenty-five years, the total rentals accruing under the lease will belong to the life tenants,

for it has been stipulated by the parties in the lease that if it shall terminate with the trust there shall be no liability on the part of the trustees for reimbursement, compensation or damages to the lessee. It is unnecessary, however, to decide this question at this time because, for another reason, it would be inequitable to require the whole of the $90,000 to be paid now in one lump sum to those at present entitled as life tenants and equitable that that sum be paid in installments only. That reason is that the personnel of the life tenants is subject to change. In the eight years that have elapsed since the inception of the lease one such change has already occurred, one of the children of the testator having died, leaving no issue, and the income which he, if living, would have received going, under the provisions of the will, to his brothers and sisters. There may yet be other such changes during the life of the lease. One or more others of the children of the testator may die, either leaving issue, who thereupon become entitled to their shares, or not leaving issue and their shares thus passing to the surviving brothers and sisters. It was obviously the intention of the testator that the income of the estate should be paid to the income-takers at ordinary and fairly frequent periods of distribution. It would be unreasonable to hold that he intended, under the provisions of his will, that in case of a payment in gross in advance as rental for the full period of the lease, the income should all go to those who happened at that time to be the income-takers, to the exclusion of those who would be entitled thereafter under ordinary methods of payment of rents and distribution of income. There was in fact no actual payment of $90,000 in cash. In asking for a readjustment the life tenants are asking that their equities be considered so that justice may be done them by the remaindermen. All of the equities should be considered. By requiring that

the reimbursement be made in periodical installments and not in a lump sum, justice is also done to each and all of the life tenants as between themselves and provision is also made for the doing of justice to the remaindermen as income-takers under the lease, if it shall be hereafter declared that they are so entitled. At the same time, if it shall be found that the remaindermen are not so entitled as income-takers under the lease, the moneys will be on hand for further distribution to the heirs of those who were life tenants at the time when the original installments were paid.

There are other reasons rendering it inadvisable to express an opinion at this time on the question whether the lease will continue in effect after the death of the last life tenant, if that death shall take place before the expiration of the twenty-five years named in the lease. The lessee, the Hawaiian Dredging Company, Limited, is not a party to this proceeding and has not been heard. The trustees of the estate of the decedent, while parties, have not been heard since their attitude in this matter has been, in conformity with opinions heretofore expressed by this court, one of neutrality as between the claims of the life tenants on the one hand and the remaindermen on the other, both of those classes of beneficiaries being parties and represented and actively presenting their various contentions. Then again, even if it were decided now that the lease will continue in effect only until the trust terminates, it is not known how long the life tenants will live and it therefore cannot be determined now what fractional part of the total of the fund, principal and interest, should be paid to the life tenants as a group each year or each half year, that is to say, whether to apportion to them one-fiftieth each half year, on the theory that they will survive the twenty-five-year period; or to apportion to them one-fortieth on the theory that the last survivor will live only

twenty years of the period of the lease; or some smaller fraction on the theory that the last survivor will live only a shorter portion of the term. And if, on the other hand, it is held that the lease will be good for the full term of twenty-five years, that is, even after the trust terminates, then the method being adopted in the decree to be entered hereunder, of using the fractional apportionment which is based upon the theory of the lease lasting for twenty-five years will prove to be entirely correct.

The lease was dated July 1, 1920, and was for a term of twenty-five years and ten months from January 23, 1919, to November 22, 1944. A period of about eight years has already elapsed since the commencement of the term of the lease. Those who have been income-takers in the past should be paid now so much of their proper allotment, based upon the foregoing views, as has already accrued, for the eight years or thereabouts last past, less the income which they have already received during that eight-year period, from the capital of $90,000.

It seems to be equitable under all the circumstances of this case to order the installments of these equivalents of rent to be paid to the income-takers at intervals of six months. Both the income-takers and the remaindermen have expressed themselves at the hearing in this court to be in accord with this provision (subject only to the contention of the remaindermen that the income-takers have paid nothing for the making of the fill and are not entitled to any reimbursement whatever at this time).

Our conclusion is as follows: in effect the remaindermen have not thus far paid anything for the making of the fill and the income-takers have paid the whole cost of the fill, in that the payment to the dredging company was the giving of a lease free of rent (other than

as above stated) to it for the term of twenty-five years, of land which was part of the corpus of the estate and the whole income of which ought, under the provisions of the will of the decedent, to have been paid to the income-takers; that the fill was a permanent improvement which became a part of the land and will endure as long as the land itself endures; that the requirements of equity are that the cost of the fill should be apportioned between the remaindermen and the income-takers so that the remaindermen will ultimately pay the principal cost of the fill and the income-takers will bear the loss of the interest on that cost; that at the date of the lease the then present worth of the rentals receivable from the leased property was $90,000 and that, in other words, the value of the lease and compensation paid to the dredging company by the income-takers at that date was $90,000; that the remaindermen should reimburse the income-takers for this $90,000; that the trustees be directed to transfer from the corpus of the estate bonds or other suitable assets of the estate of the value of $90,000 into a separate fund which with its accumulations of interest shall be used for meeting the installments herein provided for to be paid to the income-takers from time to time; that for the reasons above stated this payment of $90,000 should not be made now in one lump sum; that in lieu of such a lump sum payment the matter should be treated as though at the date of the lease the trustees had set apart from the assets of the estate then on hand assets of the value of $90,000 into a fund which should then be put out at interest and invested in such securities as are proper for the investment of trust funds and as though simple interest had been accumulated thereon (with the limitations hereinafter stated) for the full term of the lease, to-wit: twenty-five years; that there being in the term of the lease, twenty-five years and ten months, a total

of three hundred and ten months,—the total of the principal of $90,000 plus the simple interest so to be accumulated should be divided into three hundred and ten equal installments; that ten of those installments should be regarded as the principal and interest divisible amongst and payable to the income-takers during the first ten months of the lease and that six of those installments should be divisible among and payable to the proper income-takers at the end of each successive six-month period thereafter until the termination of the period of the lease, whether that period be twenty-five years or less by reason of the termination of the trust; that the simple interest above referred to should be calculated upon the balance only of the principal of $90,000 remaining after the division and payment of each installment of principal above mentioned (this being the limitation hereinbefore referred to) ; that the simple interest above mentioned be calculated at the rate of five per cent per annum for the whole of the term of twenty-five years and ten months; that there be paid now to the income-takers of the past, as they existed from time to time at each installment date, all of the installments which should have been paid prior to November 22, 1927, less interest at five per cent for the same past period on the $90,000, which under the finding of this court they have actually received during the same past period; that bearing in mind that some compound interest will accumulate during the period of twenty-five years and ten months, the amount of which cannot now be foreseen with accuracy, and that the rate of interest properly receivable by the trustees and to be actually received by them during the now unexpired remainder of that term of twenty-five years and ten months may be greater or may be less than the five per cent assumed and provided for, the decree to be entered hereunder should contain a provision that it may be

at any time, upon application of any of the parties interested, amended so as to authorize distribution of any excess in the fund which is not by the original decree ordered to be distributed and so as to provide on the other hand for any failure of the fund to grow to the proportions to be assumed in and by the original decree to be entered hereunder; that unless and until otherwise provided the proceeds of any such higher rate of interest received and the accumulations of any compound interest will be a part of the general fund and available to counterbalance any temporary lessening of the fund due to the receipt of less than five per cent interest in any one year; and that if the lease terminates, with the trust, before the expiration of twenty-five years and ten months from its date, the then undivided balance of the fund, both principal and interest, shall be paid to the heirs of those who were income-takers at each installment date and in the same proportions in which their ancestors would have taken it if the correct length of the period of the existence of the lease had been foreseen and followed in the original decree.

Reference will now be made to a contention made on behalf of the life tenants to the effect that they should not be regarded as having received five per cent or any other rate of interest on $90,000 during the first three years or thereabouts from and after the date of the lease, the ground of the contention being that none of the filled lands had been sold and therefore their proceeds had not been invested prior to the termination of that three-year period. The facts in this connection are agreed upon by the parties and a memorandum of them, taken from the books of the trustees and so agreed upon, has been submitted and is on file. In addition to the date and term of the lease, already appearing above, those facts are that property at Iwilei was sold at the times and in the areas and for the amounts below stated:

on June 30, 1920, to the Union Oil Company of California, 3.229 acres (unfilled land) for $96,870; on April 25, 1923, to the Hawaiian Pineapple Company, 4.243 acres for $169,720; on December 29, 1923, to the Hawaiian Pineapple Company, 2.877 acres for $115,000; and on March 8, 1923, to the Pacific Guano & Fertilizer Company, 3.795 acres for $150,000,—the last three pieces being filled land and the total from the four sales being $531,590. From the same source it appears that the gross income of the estate for the years below mentioned was as follows: for 1919, $10,720.82; 1920, $14,693.20; 1921, $18,268.72; 1922, $19,669.68; 1923, $37,795.21; 1924, $44,608.15; 1925, $49,597.15; and 1926, $53,528.77. It also so appears that the value of the personal property of the estate as of December 31, 1919, was $19,700.99, and that as of the same date the value of the real property of the estate, from which income was received, was $229,000. Under these circumstances we cannot sustain the contention last mentioned. Our effort is to place the parties now in as nearly the same position as possible as they would have been in at the date of the lease if on that date the trustees had transferred to and set apart in a separate fund, as above mentioned, assets of the value of $90,000. Those assets were available, as the evidence last referred to shows, either for actual transfer to the fund or to be used by way of mortgage for securing such a fund in cash. If the assets had been so mortgaged or transferred, the income-takers would have either paid the interest on the mortgage or suffered the loss of it by reason of the transfer and, as the same evidence shows, at the date of the lease there was annual income which they actually received in more than the total sum per annum ($5778.36), which, under this opinion and the decree to be entered in conformity therewith, is to be credited to the income-takers as of each of the first three years (as

well as of subsequent years) of the term of the lease. It is not the fact of the sale or non-sale of the filled lands during this first three years which is determinative of whether the income-takers should be regarded as having received five per cent on $90,000 during those three years, but what does determine the issue is whether or not during that time they did receive that much income which under the provisions of the decree, if entered on that date, they would have ceased to receive. The latter is what we find to be the fact upon the undisputed evidence.

The other set of items objected to by the life tenants relates to the treatment by the trustees in their accounts of certain reimbursements for assessments paid for improvements made by the city and county on streets adjoining certain land owned by the estate and situate in Kalia. In the former proceedings it was judicially decreed that any such assessments paid by the estate should be borne 25.8% by the remaindermen and 74.2% by the life tenants. In the accounts under consideration the trustees report having paid certain annual installments of the assessments, charging them to the parties in accordance with the decree, and to have been reimbursed for portions of those assessments by tenants occupying parts of the land under leases containing covenants requiring them to pay any and all such assessments levied against the demised property. Of the moneys received from the lessees the trustees credited 25.8% to the remaindermen and 74.2% to the life tenants. The objection of the latter is that they should have been credited with the whole of the moneys so received.

It is true that for some purposes, as held in the case entitled *In re Wharton*, 28 Haw. 502, moneys received by trustees from lessees under covenants to pay taxes are to be deemed in effect a part of the rent for the use of the demised premises. That was, however,

purely upon the question of whether the trustees would be entitled to receive commissions upon the moneys so received. That rule does not apply under the facts of the case at bar. The covenant of the lessees was to pay the taxes. They could have properly discharged that obligation by going directly to the territorial authorities and paying to them the amount of the taxes. The trustees acted in the matter purely as a conduit for the transfer of the amount of the taxes from the lessees to the Territory. The crediting by the trustees, shown by their accounts, of the moneys received from the lessees for the taxes to the parties against whom the original payments by the trustees had been charged was correct. The ultimate effect of the transactions and entries is, as it should be, that neither the life tenants nor the remaindermen paid the assessments and that the lessees alone paid them.

A decree in conformity with the foregoing views will be entered on presentation.

*H. L. Wrenn* (also on the briefs) for the guardian *ad litem.*

*Marguerite K. Ashford* (*Thompson, Cathcart & Beebe* with her on the briefs) for Thos. K. Ena.

*Prosser, Anderson & Marx* for the trustees.